**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | | |
|---|---|---|---|
| **HERI KRUPA, INC.** | : | **CIVIL ACTION** | |
| | : | | |
| **v.** | : | | |
| | : | | |
| **TOWER GROUP COMPANIES, TOWER** | : | **NO.** | **12-4386** |
| **GROUP, INC. and PRESERVER** | : | | |
| **INSURANCE COMPANY** | : | | |

## MEMORANDUM OPINION

**Savage, J.**                                                                                    **March 18, 2013**

At issue in this insurance dispute is the "pollution" exclusion in a business owner's property insurance policy issued to the owner and operator of a convenience store, car wash, and gas and diesel service station. The plaintiff, Heri Krupa, Inc. ("Krupa"), asserts that the defendant insurer, Preserver Insurance Company[1] ("Preserver"), breached the insurance contract when it failed and refused to pay business income loss benefits arising from the shut-down of the business after the release and discharge of diesel fuel from a ruptured hose.[2] Preserver contends that the loss is not covered and is specifically excluded by the policy.

The parties disagree what the policy language means and whether the pollution exclusion applies.[3] The facts material to the interpretation of the policy are undisputed.

---

[1] The plaintiff named as defendants not only Preserver Insurance Company, but also Tower Group Companies and Tower Group, Inc. The policy was issued by Preserver which is a member of the Tower Group, Inc.

[2] In its complaint, Krupa asserted two causes of action, one for breach of contract and the other for bad faith. Krupa has since voluntarily dismissed the claim for bad faith.

[3] The parties also dispute whether Krupa ever received the policy containing the pollution exclusion. Whether the policy was received is immaterial. As addressed in detail below, even if the pollution exclusion applied and Krupa did not receive a copy of the policy, Krupa could not have reasonably expected coverage for the loss of income due to the fuel spill.

A rupture in a flex hose caused a massive discharge of diesel fuel.[4]  The released fuel caused contamination at the insured's property, requiring corrective action and temporary closure of the station as ordered by Pennsylvania Department of Environmental Protection ("DEP").  As a result of action taken by DEP, Krupa was forced to shut down its business operations, suffering financial losses.  At the time, Krupa was covered by the Preserver policy, which provides business income loss benefits.  The policy includes a pollution exclusion.  Absent the exclusion, the losses are otherwise covered.

After giving effect to the plain language of the policy and strictly construing the exclusion against Preserver, we conclude that the pollution exclusion applies to the business income loss benefit.  Therefore, we shall grant Preserver's motion for summary judgment.

## Factual Background

Krupa owned and operated a convenience store, car wash, and retail gasoline and diesel service station in Pottstown, Pennsylvania.  In March 2010, Krupa discovered a release of diesel fuel from a rupture in a flex-hose beneath the diesel fuel dispenser.  Bristol Environmental and Service Company, Krupa's maintenance firm, notified and filed a Notice of Contamination with DEP identifying the source of contamination as the underground piping system.  DEP ordered Krupa to take corrective and remedial action.  There followed a series of violation notices from DEP

---

[4] Krupa does not dispute that the leak came from a hose.  Pl.'s Resp. to Defs.' Summ. J. Mot. ("Pl.'s Resp.") ¶ 7.  It disputes what caused the rupture in the hose.  *Id.* ¶ 9.  In its answers to interrogatories, Krupa states that the release is "believed to be due to faulty/defective hose."  Statement of Undisputed Facts of Defs. in Supp. of their Mot. for Summ. J. ("DSUF"), Ex. B ¶ 7.  At his deposition, Daniel Forrest, Krupa's maintenance contractor, testified that he thought it was due to wear and tear.  Forrest Dep. 26:4-16.

and attempted corrective actions by Krupa and Brilliant Lewis Environmental Services ("Brilliant"), Krupa's contractor.

In July 2010, dissatisfied with Krupa's corrective actions, DEP issued a cease and desist order pursuant to the Storage Tank and Spill Prevention Act. In its findings, DEP determined that there had been a release of more than 7,000 gallons of petroleum that contaminated soil and groundwater at the site, which required an "aggressive interim remedial response" to "protect human health and the environment."[5] The cease and desist order required Krupa to stop using its fuel tanks until it completed the corrective action as ordered. In compliance with the order, Krupa emptied its fuel tanks and shut down petroleum service.

Corrective actions continued through 2011 and 2012. The Underground Storage Tank Indemnification Fund paid for all remediation activities at the site. In September 2012, a Remedial Action Plan confirmed a decreasing trend in contamination levels. At his deposition on December 11, 2012, Pritesh Patel, Krupa's president, testified that although the site was no longer contaminated, Krupa still did not have permission to operate a business.[6]

In the meantime, due to contamination of water at the site, DEP prohibited service of food products at the convenience store. Consequently, Krupa's tenant, Dunkin' Donuts, shut down its operation and canceled its lease.

Krupa submitted a claim under the Preserver policy, which was in effect from December 17, 2009 through December 17, 2010. Relying on the pollution and

---

[5] DSUF, Ex. I at 3.

[6] Patel Dep. 65:22-66:3.

ordinance exclusions,[7] Preserver denied the claim.  Krupa then brought this action for breach of the insurance contract and insurance bad faith in state court, seeking damages for loss of rent, loss of business income, loss of inventory and damage to the covered property, and other damages under the policy.  Preserver removed the action to this court.

## Legal Standard

The interpretation of an insurance contract is a question of law.  *Am. Auto. Ins. Co. v. Murray*, 658 F.3d 311, 320 (3d Cir. 2011) (citations omitted).  Whether a claim is within a policy's coverage or barred by an exclusion may be determined on a motion for summary judgment.  *Bishops, Inc. v. Penn Nat'l Ins.*, 984 A.2d 982, 989 (Pa. Super. Ct. 2009) (quoting *Nationwide Mut. Ins. Co. v. Nixon*, 682 A.2d 1310, 1313 (Pa. Super. Ct. 1996)).

A court must give effect to the plain language of the insurance contract read in its entirety.  *Am. Auto Ins. Co.*, 658 F.3d at 320 (citation omitted).  When the policy language is ambiguous, the provision is construed in favor of the insured.  *Id.* (quoting *Med. Protective Co. v. Watkins*, 198 F.3d 100, 104 (3d Cir. 1999)); *401 Fourth St., Inc. v. Investors Ins. Grp.*, 879 A.2d 166, 174 (Pa. 2005) (citing *Mohn v. Am. Cas. Co. of Reading*, 326 A.2d 346, 352 (Pa. 1974)).  Contract language is ambiguous if it is reasonably susceptible to more than one construction and meaning.  *401 Fourth St., Inc.*, 879 A.2d at 171 (quoting *Madison Constr. Co. v. Harleysville Mut. Ins. Co.*, 735 A.2d 100, 106 (1999)).  However, policy language may not be stretched beyond its plain meaning to create an ambiguity.  *Trizechahn Gateway LLC v. Titus,* 976 A.2d 474, 483 (Pa. 2009) (citation omitted).

---

[7] Because the pollution exclusion is dispositive, we do not address the ordinance exclusion.

The insured has the initial burden of establishing coverage under the policy. *State Farm Fire & Cas. Co. v. Estate of Mehlman*, 589 F.3d 105, 111 (3d Cir. 2009) (citing *Koppers Co. v. Aetna Cas. and Sur. Co.*, 98 F.3d 1440, 1446 (3d Cir. 1996)). Where the insured meets that burden and the insurer relies on a policy exclusion as an affirmative defense as the basis for denying coverage, the insurer has the burden of proving, by uncontradicted facts, that the exclusion applies. *Id.*; *Mistick, Inc. v. Nw. Nat'l Cas. Co.*, 806 A.2d 39, 42 (Pa. Super. Ct. 2002). Policy exclusions are strictly construed against the insurer. *Nationwide Mut. Ins. Co. v. Cosenza*, 258 F.3d 197, 206-07 (3d Cir. 2001) (citing *Selko v. Home Ins. Co.*, 139 F.3d 146, 152 n.3 (3d Cir. 1998)).

## Analysis

Krupa made a claim for loss of income resulting from the closing of his business and the tenant's canceling of its lease under the Businessowners endorsement, which provided coverage for twelve months of lost income.[8] This provision in the Businessowners Property Coverage Form reads:

> We will pay for the actual loss of Business Income you sustain due to the necessary suspension of your "operations or restoration". The suspension must be caused by direct physical loss of or damage to property at the described premises. The loss or damage must be caused by or result from a Covered Cause of Loss. With respect to loss of or damage to personal property in the open or personal property in a vehicle, the described premises include the area within one hundred feet of the site at which the described premises are located.[9]

By definition, the business interruption must be caused by a "Covered Cause of Loss." Thus, we must determine whether the ruptured fuel line was a covered cause.

---

[8] Policy No. UN 1450 0906, § I.A.5.f(1)(a), DSUF, Ex. D.

[9] *Id.*

As in any other typical "all-risk" policy, a covered cause of loss is defined in the Preserver policy as "risks of direct physical loss unless the loss is" excluded or limited in the policy.[10]  In other words, unless specifically excluded, the loss is covered.

The Businessowners Property Coverage provides coverage for physical loss of or damage to "covered property" caused by or resulting from a "covered cause of loss."[11]  It provides:

> We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.[12]

The "Covered Property" under the Businessowners Property Coverage, as modified by the Property Extension Endorsement, includes "[a]bove and below ground gasoline, diesel or kerosene fuel storage tanks, pumps, hoses, nozzles, piping and other related equipment pertaining to the transfer of fuel from the tank to the pump . . ." and "[g]asoline, diesel or kerosene fuel held for sale located in above and below ground storage tanks . . . ."[13]  The ruptured hose was used to transfer diesel fuel from a tank to a pump.  It was clearly "covered property" as defined in the policy.

This does not conclude the analysis.  We now must determine whether the loss or damage was caused by a "covered cause of loss."

Preserver agreed to pay for actual loss of business income sustained due to the "necessary suspension" of operations during the "period of restoration."[14]  The policy

---

[10] *Id.* at § I.A.3.

[11] *Id.* at § I.A.

[12] *Id.*

[13] Property Extension Endorsement, Policy No. UN 1159 0906, §§ A.12. and 13., DSUF, Ex. D.

[14] Policy No. UN 1450 0906, § I.A.5.f(1)(a).

reads, "[t]he suspension must be caused by direct physical loss of or damage to property at the described premises. The loss or damage must be caused by or result from a Covered Cause of Loss."[15]

Because the physical damage was to covered property and the interruption was related to that damage, the business income loss is covered unless it is excluded. Among the policy exclusions is the pollution exclusion, which states:

> We will not pay for loss or damage caused by or resulting from the discharge, dispersal, seepage, migration, release or escape of "pollutants" unless the discharge, dispersal, seepage, migration, release or escape is itself caused by any of the "specified causes of loss." But if the discharge, dispersal, seepage, migration, release or escape of "pollutants" results in a "specified cause of loss," we will pay for the loss or damage caused by that "specified cause of loss.[16]

According to this provision, loss or damage caused by a pollutant is not covered unless the release of the pollutant was caused by a "specified cause of loss." A "specified cause of loss" is defined as "fire; lightning; explosion; windstorm or hail; smoke; aircraft or vehicles; riot or civil commotion; vandalism; leakage from fire extinguishing equipment; sinkhole collapse; volcanic action; falling objects; weight of snow, ice or sleet; water damage."[17] None of these occurrences caused the fuel release. Although the cause of the rupture has not been definitively identified, there is no question that the rupture of a flex hose is not a "specified cause of loss" as defined in

---

[15] *Id.*

[16] *Id.* at § I.B.2.j.

[17] *Id.* at § I.H.11.

the policy.[18]  Thus, if the discharged fuel is a "pollutant" as defined in the policy, the loss

caused by it is excluded.

It is undisputed that Krupa suffered business income loss because of the release

of more than 7,000 gallons of diesel fuel.   Preserver asserts that diesel fuel is a

pollutant.[19]  It cites to the report prepared by Brilliant, Krupa's contractor, identifying the

hazardous components of unleaded gasoline.   In response, Krupa summarily asserts

that this case is about diesel fuel, not gasoline, suggesting that diesel fuel is not a

pollutant.[20]  However, at oral argument, Krupa's counsel conceded that diesel fuel can

be a pollutant.  In any event, we conclude that diesel fuel is a pollutant.

The term "pollutant" is defined in the policy as "any solid, liquid, gaseous or

thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis,

chemicals and waste.   Waste includes materials to be recycled, reconditioned or

---

[18] Once Preserver demonstrates that an exclusion is triggered, the burden is on Krupa to prove an exception to the exclusion.  *Spector v. Fireman's Fund Ins. Co.*, 451 F. App'x 130, 136 (3d Cir. 2011) (citing *Air Prods. & Chems., Inc. v. Hartford Accident & Indem. Co.*, 25 F.3d 177, 180 (3d Cir. 1994) ("The burden is on the insured, not the insurer, to introduce evidence to show that the exclusion which appears to be triggered does not apply after all."); *see also Northern Ins. Co v. Aardvark Assocs., Inc.*, 942 F.2d 189, 195 (3d Cir. 1991) (holding once insurer demonstrated pollution exclusion was triggered, burden shifted to insured to demonstrate "sudden and accidental" exception).  In other words, the burden is on Krupa to demonstrate that the rupture was due to a "specified cause of loss," making the exception inapplicable.

At oral argument, Krupa's counsel argued the flex hose may have ruptured due to an explosion. Significantly, Krupa did not mention this argument in its briefs.  *Pichler v. UNITE*, 542 F.3d 380, 396 n.19 (3d Cir. 2008) (arguments raised for the first time during oral argument are deemed waived).  Even if we were to consider Krupa's new argument, Krupa does not offer any evidence to support its hypothetical that the rupture could have been due to an explosion.  Krupa's counsel suggested that Daniel Forrest, Krupa's maintenance contractor who is not presented as an expert, believed that the flex hose could have been due to an explosion. However, at his deposition, Forrest testified that he thought it was due to wear and tear.  Forrest Dep. 26:4-16.  In any event, Forrest's unsupported lay opinions and beliefs are insufficient to demonstrate that the rupture was due to a "specified cause of loss."

[19] Although Krupa does not dispute that the policy contains a pollution exclusion, it disputes the interpretation and effect of the exclusion and its applicability to the claim.  It also contends that the exclusion is "ambiguous, unclear" and "not conspicuously displayed."  Pl.'s Br. in Resp. to Defs.' Mot. for Summ. J. ("Pl.'s Br.") at 9.  Krupa does not identify the ambiguity in the language.  Nor do we find any.

[20] Pl.'s Resp. ¶¶ 21-29.

reclaimed."[21]  "Irritant" has been defined as "a biological, chemical, or physical agent that stimulates a characteristic function or elicits a response, especially an inflammatory response."  *See, e.g.*, *Municipality of Mt. Lebanon v. Reliance Ins. Co.*, 778 A.2d 1228, 1233 (Pa. Super. 2001) (quoting Webster's New Universal Unabridged Dictionary (1989)).  A medical dictionary defines "irritant" as "an agent that is toxic, bacterial, physical, or chemical and is capable of inducing functional derangements or organic lesions of the tissues."  Mosby's Medical Dictionary, 8th ed. 2009, Elsevier.  A "contaminant" is defined as "an agent that causes contamination, pollution, or spoilage."  *Id.*[22]

Although Pennsylvania courts have not addressed whether diesel fuel is a pollutant, they have held that gasoline, another petroleum distillate product, is a pollutant.  *See e.g.*, *Wagner v. Erie Ins. Co.*, 801 A.2d 1226, 1232 (Pa. Super. 2002) (holding gasoline was a "pollutant"); *see also W. World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118 (2d Cir. 1990) (holding that pollution exclusion included fuel oil spill); *Guilford Indus. Inc. v. Liberty Mut. Ins. Co.*, 688 F. Supp. 792 (D. Me. 1988) (ruling that property damage from rupture of oil tanks was within the pollution exclusion), *Aeroquip Corp. v. Aetna Cas. & Sur. Co.*, 26 F.3d 893, 894 (9th Cir. 1994) (assuming without explanation that diesel fuel is a pollutant); *Breese v. Hadson Petroleum (USA), Inc.*, 955 F. Supp. 648, 651 (M.D. La. 1996) (finding that diesel fuel is a "liquid contaminant" under the policy's pollution exclusion language); *Owners Ins. Co. v. Farmer*, 173 F. Supp. 2d 1330, 1333 (N.D. Ga. 2001) (holding that diesel fuel is a "pollutant" under the policy).

---

[21] Policy No. UN 1450 0906, § I.H.9.

[22] "Contaminant" is defined as "something that contaminates."  Merriam-Webster's Collegiate Dictionary 269 (11th ed. 2003).  "Contaminate" is defined as "to soil, stain, corrupt, or infect by contact or association; to make unfit for use by the introduction of unwholesome or undesirable elements."  *Id.*

In this case, DEP determined that the discharge of the diesel fuel contaminated the soil and groundwater at the site, and entered a drainage basin on the property, impacting a tributary of a local creek.[23]   The release necessitated "an aggressive remedial response . . . to protect human health and the environment."[24]   The groundwater samples collected by Brilliant revealed the presence of benzene, 1,2,4-trimethylbenzene, and naphthalene at the site and adjacent properties.   All three of these chemicals are classified as "hazardous substances" by the Environmental Protection Agency and the Commonwealth of Pennsylvania.  40 C.F.R. § 302.4; 35 P.S. § 7303.  Due to their toxic effects, they are governed by federal and state regulation. Based upon governmental classification of the components of diesel fuel as hazardous and toxic chemicals, DEP's implicit finding that it endangered human health and the environment, and that its mixing with the soil and water contaminated the soil and water, and the ordinary definition of "contaminant," we conclude that diesel fuel fits the policy definition of "pollutant."   Therefore, by virtue of the pollution exclusion, the loss of business income during the time Krupa was shut down to perform remediation and restoration is not covered.

Krupa next argues that the equipment breakdown coverage endorsement and the pollution and cleanup removal coverage apply.  Krupa contends that a rupture of the flex-hose constitutes an equipment breakdown.   It ignores the specific exclusion of underground piping.

The equipment breakdown coverage endorsement extends "Covered Causes of Loss" as follows:

---

[23] DSUF ¶ 17, Ex. I at 2.

[24] *Id.*, Ex. I at 3.

> We will pay for direct physical damage to Covered Property that is the direct result of an "accident." As used in this Additional Coverage, "accident" means a fortuitous event that causes direct physical damage to 'covered equipment.'" The event must be one of the following: a. mechanical breakdown, including rupture or bursting caused by centrifugal force . . . .[25]

"Underground vessels or piping" are excluded from the definition of "covered equipment."[26]

To overcome Preserver's assertion that the ruptured flex-hose "ran underground," Krupa argues that the flex hose "is a short piece that is located just below the surface of the ground."[27] No matter how close it is to the surface of the ground, it is still underground. Consequently, because the "flex hose" is not "covered equipment," the covered equipment coverage does not apply.

Krupa also requests coverage pursuant to the Pollutant Clean Up and Removal provision. This provision states as follows:

> We will pay your expense to extract "pollutants" from land or water at the described premises if the discharge, dispersal, seepage, migration, release or escape of the "pollutants" is caused by or results from a Covered Cause of Loss that occurs during the policy period.[28]

The maximum amount Preserver agreed to pay pursuant to this provision is $25,000. The Underground Storage Tank Indemnification Fund ("USTIF") paid for all remediation activities at the site. Krupa is not presenting a claim for the clean-up costs, other than

---

[25] Equipment Breakdown Coverage Endorsement, Policy No. UN 1173 1006, § A.1.a, DSUF, Ex. D.

[26] *Id.* at E.2.b(3).

[27] Pl. Resp. ¶ 9.

[28] Policy No. UN 1450 0906, § I.A.5.h.

the USTIF deductible.[29]    Because USTIF paid for all extraction and remediation expenses, and because business income losses are not covered by the "pollutant clean up and removal" provision, this provision is inapplicable to Krupa's claim for those losses.

## Reasonable Expectations

Krupa argues that this interpretation frustrates its reasonable expectations.  We conclude that the undisputed facts show that it did not reasonably expect the coverage it now asserts exists.

The guiding principle in interpreting an insurance contract is to effectuate the reasonable expectations of the insured.  *Reliance Ins. Co. v. Moessner*, 121 F.3d 895, 903 (3d Cir. 1997) (citations omitted); *Safe Auto Ins. Co. v. Berlin*, 991 A.2d 327, 331 (Pa. Super. Ct. 2010) (citation omitted).  Under Pennsylvania law, even if the terms of the insurance contract are clear and unambiguous, the insured's reasonable expectations may prevail over the express terms of the contract.  *Bensalem Twp. v. Int'l Surplus Lines Ins. Co.*, 38 F.3d 1303, 1309 (3d Cir. 1994); *see also Safe Auto Ins. Co.*, 991 A.2d at 331 ("[A] court's decision to look beyond the policy language is not erroneous under all circumstances." (citation omitted)).  Nonetheless, the language of the insurance contract itself serves as the best evidence of the parties' reasonable

---

[29] Pl.'s Br. in Resp. to Defs.' Reply Br. Filed in Supp. of Mot. for Summ. J. at 17.  The amount payable under the Pollutant Clean Up & Removal provision is capped at $25,000.  Property Extension Endorsement, Policy No. UN 1159 0906, § A.1.  At oral argument, Preserver's counsel agreed that, upon presentation, it will pay the deductible and any remaining expenses of extracting diesel fuel from the site up to the policy limits.

expectations. *Safe Auto Ins. Co.*, 991 A.2d at 332 (quoting *Allstate Ins. Co. v. McGovern*, No. 07-2486, 2008 WL 2120722, at *2 (E.D. Pa. May 20, 2008)).[30]

Krupa contends that it intended to purchase an all-risk policy covering all losses related to the business of operating a gas station. It asserts that it expected to be covered because Preserver's agent represented that the policy was "all-risk" and did not mention any exclusions.[31] Krupa did get an all-risk policy as promised. An all-risk policy covers all losses except those specifically excluded. *Spece v. Erie Ins. Grp.*, 850 A.2d 679, 683 (Pa. Super. Ct. 2004). Thus, like any other all-risk policy, the Preserver policy included exclusions, in particular, the pollution exclusion.

Significantly, following Patel's deposition, during which he asserted that he never received a copy of the policy, Krupa produced its older policy, the 2007-2008 Nationwide Businessowners Policy endorsed with a pollution exclusion identical to the one in the Preserver policy.[32] Krupa, unable to locate a copy of its Nationwide policy for the 2008-2009 year, conceded that it would likely have the same terms as the 2007-2008 policy.[33] Krupa does not dispute that the Nationwide policy contained the pollution

---

[30] At times, the Pennsylvania Superior Court has ruled out the use of the reasonable expectations doctrine when the insurance contract is clear and unambiguous. *See Regis Ins. Co. v. All Am. Rathskeller, Inc.*, 976 A.2d 1157, 1166 n.11 (Pa. Super. Ct. 2009) ("However, an insured may not complain that his or her reasonable expectations were frustrated by policy limitations which are clear and unambiguous.") (citations and quotations omitted); *Millers Capital Ins. Co. v. Gambone Bros. Dev. Co.*, 941 A.2d 706, 717 (Pa. Super. Ct. 2007) ("An insured, however, may not complain that its reasonable expectations have been frustrated when the applicable policy limitations are clear and unambiguous."). If we were to follow this approach, the reasonable expectations inquiry would be at an end because the relevant exclusions are clear and unambiguous. However, based on the Superior Court's more recent statement of the doctrine in *Safe Auto Insurance Co.*, 991 A.2d at 331, we shall determine whether Krupa's expectations are reasonable.

[31] Pl.'s Br. at 7.

[32] Reply Br. of Defs. in Supp. of their Mot. for Summ. J., Ex. T.

[33] *Id.* at 2-3.

exclusion. The pollution exclusion in the Preserver policy, which replaced the Nationwide Businessowners Policy, is identical to the one in the Nationwide policy.

There is no evidence that Krupa specifically sought or expected pollution coverage when it shopped for and secured coverage to replace the Nationwide policy. On the contrary, Krupa sought and received precisely what he requested, an all-risk insurance policy.[34] Considering the language in Krupa's previous policy and the Preserver policy, together with Patel's testimony, there is no genuine issue of fact about whether Krupa had a reasonable expectation of coverage for loss of income due to pollution.

## Conclusion

The pollution exclusion applies to Krupa's business income losses. Even if Krupa did not receive the policy, it could not have reasonably expected coverage under the Preserver policy when its previous "all-risk" policy included an identical pollution exclusion provision. Therefore, we shall grant the defendant's motion for summary judgment.

---

[34] The facts in this case are distinguishable from *Tonkovic, III v. State Farm Mutual Automobile Ins. Co.*, 521 A.2d 920 (Pa. 2003). In *Tonkovic*, the Pennsylvania Supreme Court ruled that the exclusion was unenforceable because it violated the insured's "reasonable expectations" since he was "never made aware of the substantial discrepancy between the coverage for which he applied and that which the policy actually provided." *Id.* at 925. The Court found:

> a crucial distinction between cases where one applies for a specific type of coverage and the insurer unilaterally limits that coverage, resulting in a policy quite different from what the insured requested, and cases where the insured received precisely the coverage that he requested but failed to read the policy to discover clauses that are the usual incident of the coverage applied for.

*Id.* The facts in this case are more analogous to the second category, in which the insured receives "precisely the coverage that he requested," even though he did not read the policy because it was allegedly never provided to him.